IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DELAWARE STRONG FAMILIES,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH R. BIDEN III, in his official capacity as Attorney General of the State of Delaware; and ELAINE MANLOVE, in her official capacity as Commissioner of Elections for the State of Delaware,<br><br>Defendants. | ) | Civ. No. 13-1746-SLR |

---

David E. Wilks, Esquire of Wilks, Lukoff & Bracegirdle, LLC, Wilmington, Delaware. Counsel for Plaintiff Delaware Strong Families. Of Counsel: Allen Dickerson, Esquire and Zac Morgan, Esquire of the Center for Competitive Politics.

Joseph C. Handlon, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendants. Of Counsel: Randolph D. Moss, Esquire, Jonathan G. Cedarbaum, Esquire and Weili J. Shaw, Esquire of Wilmer Cutler Pickering Hale and Dorr LLP and J. Gerald Hebert, Esquire, Paul S. Ryan, Esquire and Megan McAllen, Esquire of The Campaign Legal Center.

---

**MEMORANDUM OPINION**

Dated: March 31, 2014
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Delaware Strong Families ("DSF") has filed a verified complaint seeking a judgment to prevent enforcement of certain provisions of the Delaware Election Disclosures Act ("the Act"), 15 Del. C. § 8001, *et seq.*, which became law on January 1, 2013. Prior to its enactment, Delaware's election laws did not regulate nonprofit corporations like DSF. In 2012, DSF distributed a voter guide[1] over the Internet within 60 days of Delaware's general election. DSF plans to engage in similar activity before the 2014 general election, and expects to incur costs over $500 in doing so. Under the Act, DSF's activities, including the publication of its voter guide, will be within the regulatory purview of the State Commissioner of Elections ("the Commissioner") and the Attorney General of the State of Delaware, defendants at bar.

More specifically, § 8031(a) of the Act requires that "[a]ny person . . . who makes an expenditure for any third-party advertisement that causes the aggregate amount of expenditures for third-party advertisements made by such person to exceed $500 during an election period shall file a third-party advertisement report with the Commissioner." 15 Del. C. § 8031(a). The report includes, *inter alia*, the names and addresses of each person who has made contributions to the "person" in excess of $100 during the election period. "Person" includes "any individual, corporation, company, incorporated or unincorporated association, general or limited partnership, society, joint stock company, and any other organization or institution of any nature." 15 Del. C. § 8002(17). "Third-party advertisement" means "an independent expenditure

---

[1]Attached to the complaint (D.I. 1) as exhibit A.

or an electioneering communication." 15 Del. C. § 8002(27). "Electioneering communication" means "a communication by any individual or other person (other than a candidate committee or a political party) that: (1) Refers to a clearly identified candidate; and (2) Is publicly distributed within 30 days before a primary election or special election, or 60 days before a general election to an audience that includes members of the electorate for the office sought by such candidate." 15 Del. C. § 8002(10)a.

According to the legislative history of the Act, its focus was on "clos[ing] loopholes about the transparency of third-party ads" by "better regulat[ing] electioneering communications by third-parties," particularly as to "how the third party receives funding and where that money goes." (D.I. 30, ex. 1, Del. House Admin. Comm. Minutes, House Bill No. 300 (May 2, 2012)) Also apparent from the legislative history is a concern about the power vested in the Commissioner "to make an exemption without any stipulations or guidelines as to how [she] can make exemptions. As a result, the state is delegating broad authority to a single person, and this could result in potential long-term problems." (*Id.*) In this regard, 15 Del. C. § 8041(1)c gives the Commissioner the power to "adopt[ ] any amendments or modifications to the statements required under § 8021 of this title, or exemptions from the requirements thereunder." 15 Del. C. § 8041(1)c.

The court has jurisdiction over the matter pursuant to 28 U.S.C. § 1331, as the action arises under the First and Fourteenth Amendments to the United States Constitution. Venue in this court is proper under 28 U.S.C. § 1391(b)(1) and (b)(2).

## II. STANDARD OF REVIEW

In the Third Circuit, "[f]our factors determine whether a preliminary injunction is appropriate: (1) whether the movant has a reasonable probability of success on the merits; (2) whether the movant will be irreparably harmed by denying the injunction; (3) whether there will be greater harm to the nonmoving party if the injunction is granted; and (4) whether granting the injunction is in the public interest." *B.H. v. Easton Area Sch. Dist.*, 725 F.3d 293, 302 (3d Cir. 2013) (internal citation and quotation marks omitted); *see also N.J. Retail Merchs. Ass'n. v. Sidamon Eristoff*, 669 F.3d 374, 385-386 (3d Cir. 2012); *Hes v. de Jongh*, 638 F.3d 169, 172 (3d Cir. 2011). A preliminary injunction is "an extraordinary remedy," which "should be granted only in limited circumstances." *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d 2004) (citation omitted).

## III. DISCUSSION

### A. Analytical Framework

The regulation of campaign finances has a long history. The dispute at issue, therefore, cannot be adequately addressed without an understanding of the analytical framework established by Supreme Court precedent on campaign finance regulation.

#### 1. *Buckley v. Valeo ("Buckley")*

The court starts its review of such with the decision in *Buckley v. Valeo*, 424 U.S. 1 (1976), where the United States Supreme Court addressed various challenges to the Federal Election Campaign Act of 1971 ("FECA"), as amended in 1974. Appellants in *Buckley* did not challenge the disclosure requirements of FECA, 2 U.S.C. §§ 431, *et seq.*, as per se unconstitutional; they instead argued that several provisions were over-

broad as applied to contributions: (a) to minor parties and independent candidates; and (b) by individuals or groups other than a political committee or candidate. Of import to the disclosure requirements at bar, the Court explored the general principles related to the challenged reporting and disclosure requirements, to wit: The Court has "repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Id.* at 64. The Court has

> long . . . recognized that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest. Since *NAACP v. Alabama* we have required that the subordinating interests of the State must survive exacting scrutiny. We also have insisted that there be a "relevant correlation" or "substantial relation" between the governmental interest and the information required to be disclosed.

*Id.* (citations omitted). The Court reiterated the fact that

> [t]he right to join together "for the advancement of beliefs and ideas" . . . is diluted if it does not include the right to pool money through contributions, for funds are often essential if "advocacy" is to be truly or optimally "effective." Moreover, the invasion of privacy of belief may be as great when the information sought concerns the giving and spending of money as when it concerns the joining of organizations, for "[f]inancial transactions can reveal much about a person's activities, associations, and beliefs."

*Id.* at 65-66 (citations omitted). In addressing the other side of the scale, the Court identified the governmental interests sought to be vindicated by the disclosure requirements: (1) providing the electorate with information "'as to where political campaign money comes from and how it is spent by the candidate' in order to aid the voters in evaluating those who seek federal office;" (2) "deter[ring] actual corruption and avoid[ing] the appearance of corruption by exposing large contributions and expenditures to the light of publicity;" and (3) serving as "an essential means of

gathering the data necessary to detect violations of the contribution limitations" described elsewhere in the statute. *Id.* at 66-68. The Court went on to conclude that disclosure requirements, "as a general matter, directly serve substantial governmental interests" and appear, "in most applications," "to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist." *Id.* at 68.

With respect to FECA's reporting and disclosure requirements as applied to minor parties and independents, the Court concluded that, absent evidence of a "reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties," *id.* at 74, "the substantial public interest in disclosure identified by the legislative history of [FECA] outweighs the harm generally alleged." *Id.* at 72.

In considering the disclosure provision applicable to individual contributions,[2] attacked by appellants as "a direct intrusion on privacy of belief," the Court noted that it "must apply the same strict standard of scrutiny, for the right of associational privacy . . . derives from the right of the organization's members to advocate their personal points of view in the most effective way." *Id.* at 75 (citations omitted). According to the Court, § 434(e) was

> part of Congress' effort to achieve "total disclosure" by reaching "every kind of political activity" in order to insure that the voters are fully informed and

---

[2]Section 434(e) required "[e]very person (other than a political committee or candidate) who makes contributions or expenditures" aggregating over $100 in a calendar year, "other than by contribution to a political committee or candidate," to file a statement with the Commission requiring direct disclosure of what such individual or group contributes or spends. *See Buckley*, 424 U.S. at 74-75.

> to achieve through publicity the maximum deterrence to corruption and undue influence possible. . . .
>
> In its efforts to be all-inclusive, however, the provision raises serious problems of vagueness, particularly treacherous where, as here, the violation of its terms carries criminal penalties and fear of incurring these sanctions may deter those who seek to exercise protected First Amendment rights.

*Id.* at 76-77. More specifically, § 434(e) applied to "[e]very person . . . who makes contributions or expenditures." "Contributions" and "expenditures" were defined under FECA "in terms of the use of money or other valuable assets '**for the purpose of . . . influencing**' the nomination or election of candidates for federal office. It [was] the ambiguity of this phrase that pose[d] constitutional problems" for the Court. *Id.* at 77 (emphasis added).

With the constitutional requirement of definiteness at stake in the context of First Amendment rights, the Court recognized that, "to avoid the shoals of vagueness," it had the obligation to construe the statute with a heightened degree of specificity. *Id.* at 77-78 ("Where First Amendment rights are involved, an even 'greater degree of specificity' is required."). Harking back to Congress' intent to ferret out and prevent election-related corruption, the Court explained that, when the maker of a contribution or of an expenditure is not a political committee or a candidate presumably focused on the nomination or election of a candidate for political office, "the relation of the information sought to the purposes of [FECA] may be too remote. To insure that the reach of § 434(e) is not impermissibly broad, we construe 'expenditure' for purposes of that section . . . to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate. This reading is directed precisely to

that spending that is unambiguously related to the campaign of a particular federal candidate." *Id.* at 79-80. The Court concluded that "§ 434(e), **as construed**, bears a sufficient relationship to a substantial governmental interest. **As narrowed**, § 434(e) . . . does not reach all partisan discussion for it only requires disclosure of those expenditures that expressly advocate a particular election result." *Id.* at 80 (emphasis added).

**2. *McConnell v. FEC ("McConnell")***

The Supreme Court in *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003), addressed the Bipartisan Campaign Reform Act of 2002 ("BCRA"), which amended FECA and other portions of the United States Code. "In enacting BCRA, Congress sought to address three important developments in the years since th[e] Court's landmark decision in *Buckely v. Valeo . . .*: the increased importance of 'soft money' [and] the proliferation of 'issue ads,' [as detailed in] findings of a Senate investigation into campaign practices related to the 1996 federal elections." *Id.* at 93.

> With regard to the first development, prior to BCRA, FECA's disclosure requirements and source and amount limitations extended only to so-called "hard-money" contributions made for the purpose of influencing an election for federal office. Political parties and candidates were able to circumvent FECA's limitations by contributing "soft money" - money as yet unregulated under FECA - to be used for activities intended to influence state or local elections; for mixed-purpose activities such as get-out-the-vote (GOTV) drives and generic party advertising; and for legislative advocacy advertisements, even if they mentioned a federal candidate's name, so long as the ads did not expressly advocate the candidate's election or defeat. With regard to the second development, parties and candidates circumvented FECA by using "issue ads" that were specifically intended to affect election results, but did not contain "magic words," such as "Vote Against Jane Doe," which would have subjected the ads to FECA's restrictions.

*Id.* at 93-94.

The relevant analysis to the issues at bar includes the Court's review of BCRA § 201's definition of "electioneering communications," a new term coined

> to replace the narrowing construction of FECA's disclosure provisions adopted by this Court in *Buckley*. As discussed further below, that construction limited the coverage of FECA's disclosure requirement to communications expressly advocating the election or defeat of particular candidates. By contrast, the term "electioneering communication" is not so limited, but is defined to encompass any "broadcast, cable, or satellite communication" that
>
> "(I) refers to a clearly identified candidate for Federal office;
>
> (II) is made within -
>
> (aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or
>
> (bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and
>
> (III) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate."

*Id.* at 189-190.

Consistent with the above definition, BCRA provided "significant disclosure requirements for persons who fund electioneering communications." *Id.* at 190. "The major premise of plaintiffs' challenge to BCRA's use of the term 'electioneering communication' [was] that *Buckley* drew a constitutionally mandated line between express advocacy and so-called issue advocacy, and that speakers possess an inviolable First Amendment right to engage in the latter category of speech." *Id.* The Court disagreed, clarifying that *Buckley's* "express advocacy limitation, in both the expenditure and the disclosure contexts, was the product of statutory interpretation

rather than a constitutional command."[3] *Id.* at 191-192. Nor was the Court persuaded, "independent of [its] precedents, that the First Amendment erects a rigid barrier between express advocacy and so-called issue advocacy." *Id.* at 193.

"Having rejected the notion that the First Amendment requires Congress to treat so-called issue advocacy differently from express advocacy," the Court examined the use of the term "electioneering communication" in the challenged disclosure provisions. The Court concluded

> that the important state interests that prompted the *Buckley* Court to uphold FECA's disclosure requirements - providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions - apply in full to BCRA. Accordingly, *Buckley* amply supports application of FECA § 304's disclosure requirements[[4]] to the entire range of "electioneering communications."

*Id.* at 196. While acknowledging, as it did in *Buckley*, "that compelled disclosures may impose an unconstitutional burden on the freedom to associate in support of a particular cause," *id.* at 198, nevertheless, the Court recalled that an as-applied challenge could be mounted based on "evidence that any party had been exposed to

---

[3]In this regard, the Court observed that the definition of "electioneering communication" "raise[d] none of the vagueness concerns that drove [its] analysis in *Buckley*. The term 'electioneering communication' applies only (1) to a broadcast (2) clearly identifying a candidate for federal office, (3) aired within a specific time period, and (4) targeted to an identified audience of at least 50,000 viewers or listeners." *McConnell.*, 540 U.S. at 194.

[4]BCRA § 201 amended the disclosure requirements to FECA § 304, providing that "[e]very person who makes a disbursement for the direct costs of producing and airing electioneering communications in an aggregate amount in excess of $10,000 during any calendar year shall . . . file with the [Federal Election] Commission a statement" containing certain required information. BRCA, Pub. L. No. 107-155, § 201 (codified as amended at 2 U.S.C. § 434 (f)(1)).

economic reprisals or physical threats as a result of the compelled disclosures." *Id.*

The Court then turned its attention to BCRA § 203's prohibition of corporate and labor disbursements for electioneering communications. "Since our decision in *Buckley*, Congress' power to prohibit corporations and unions from using funds in their treasuries to finance advertisements expressly advocating the election or defeat of candidates in federal elections has been firmly embedded in our law." *Id.* at 203. Section 203 of BCRA extended this rule to all "electioneering communications," as defined in BCRA §201(f)(3)(A). In response to plaintiffs' argument that "the justifications that adequately support the regulation of express advocacy do not apply to significant quantities of speech encompassed by the definition of electioneering communications," *id.* at 206, the Court explained that

> [t]his argument fails to the extent that the issue ads broadcast during the 30- and 60-day periods preceding federal primary and general elections are the functional equivalent of express advocacy. The justifications for the regulation of express advocacy apply equally to ads aired during those periods if the ads are intended to influence the voters' decisions and have that effect. The precise percentage of issue ads that clearly identified a candidate and were aired during those relatively brief preelection timespans but had no electioneering purpose is a matter of dispute . . . . Nevertheless, the vast majority of ads clearly had such a purpose. . . . Moreover, whatever the precise percentage may have been in the past, in the future corporations and unions may finance genuine issue ads during those timeframes by simply avoiding any specific reference to federal candidates, or in doubtful cases by paying for the ad from a segregated fund.

*Id.* The Court thus upheld the constitutionality of the challenged amendments.

### 3. *FEC v. Wisconsin Right to Life, Inc.* ("*WRTL*")

The Supreme Court, in *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007), had the opportunity to address BCRA § 203 again, this time

in the context of an as-applied challenge to its constitutionality. Appellee Wisconsin Right to Life, Inc. ("WRTL") was a nonprofit, nonstock, ideological advocacy corporation recognized by the Internal Revenue Service as tax exempt under § 501(c)(4) of the Internal Revenue Code. WRTL planned on running certain ads financed with funds from its general treasury, which ads would be illegal "electioneering communictions" under BCRA § 203. WRTL filed suit against the Federal Election Commission ("FEC"), seeking declaratory and injunctive relief, alleging that BCRA's prohibition on the use of corporate treasury funds for "electioneering communications" as defined in BCRA was unconstitutional as applied to its ads.[5] The Court set the stage for its analysis by reminding the readers that,

> [p]rior to BCRA, corporations were free under federal law to use independent expenditures to engage in political speech so long as that speech did not expressly advocate the election or defeat of a clearly identified federal candidate. . . . BCRA significantly cut back on corporations' ability to engage in political speech. BCRA § 203, at issue in these cases, makes it a crime for any labor union or incorporated entity - whether the United Steelworkers, the American Civil Liberties Union, or General Motors - to use its general treasury funds to pay for any "electioneering communication."

*Id.* at 457. In establishing the proper burden of proof, the Court recognized that,

> [b]ecause BCRA § 203 burdens political speech, it is subject to strict scrutiny . . . . Under strict scrutiny, the **Government** must prove that applying BCRA to WRTL's ads furthers a compelling interest and is narrowly tailored to achieve that interest. . . . This Court has already ruled that BCRA survives strict scrutiny to the extent it regulates express advocacy or its functional equivalent. . . . So to the extent the ads in these cases fit this description, the FEC's burden is not onerous; all it need do is point to *McConnell* and explain why it applies here. If, on

---

[5]The ads, entitled "Wedding," "Waiting," and "Loan," were all similar in substance and format, and similarly suggested to viewers that they contact identified politicians "and tell them to oppose the filibuster." *WRTL*, 551 U.S. at 458-459.

> the other hand, WRTL's ads are **not** express advocacy or its equivalent, the Government's task is more formidable. It must then demonstrate that banning such ads during the blackout periods is narrowly tailored to serve a compelling interest.

*Id.* at 465 (emphasis in original).

During the course of its analysis, the Court "decline[d] to adopt a test for as-applied challenges turning on the speaker's intent to affect an election," as "opening the door to a trial on every ad within the terms of § 203, on the theory that the speaker actually intended to affect an election, no matter how compelling the indications that the ad concerned a pending legislative or policy issue." *Id.* at 467-468. The Court instead embraced an objective standard: "[A] court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* at 469-470. "[C]ontextual factors[6] . . . should seldom play a significant role in the inquiry." *Id.* at 473-474.

The Court ultimately held that, "[b]ecause WRTL's ads may reasonably be interpreted as something other than as an appeal to vote for or against a specific candidate, . . . they are not the functional equivalent of express advocacy, and therefore fall outside the scope of *McConnell's* holding." *Id.* at 476. Significantly, the Court declared that it had "never recognized a compelling interest in regulating ads, like WRTL's, that are neither express advocacy nor its functional equivalent." *Id.* In the concluding passage of its opinion, the Court observed:

---

[6]For instance, that WRTL participates in express advocacy in other aspects of its work. *Id.* at 472-474.

> Yet, as is often the case in this Court's First Amendment opinions, we have gotten this far in the analysis without quoting the Amendment itself: "Congress shall make no law . . . abridging the freedom of speech." The Framers' actual words put these cases in proper perspective. Our jurisprudence over the past 216 years has rejected an absolutist interpretation of those words, but when it comes to drawing difficult lines in the area of pure political speech - between what is protected and what the Government may ban - it is worth recalling the language we are applying. *McConnell* held that express advocacy of a candidate or his opponent by a corporation shortly before an election may be prohibited, along with the functional equivalent of such express advocacy. We have no occasion to revisit that determination today. But when it comes to defining what speech qualifies as the functional equivalent of express advocacy subject to such a ban - the issue we **do** have to decide - we give the benefit of the doubt to speech, not censorship. The First Amendment's command that "Congress shall make no law . . . abridging the freedom of speech" demands at least that.

*Id.* at 481-482 (emphasis in original).

#### 4. *Citizens United v. FEC* ("*Citizens United*")

The last of the significant First Amendment cases is the Supreme Court's decision in *Citizens United v. Federal Election Commission,* 558 U.S. 310 (2010), another as-applied challenge to FECA, 2 U.S.C. § 441b, as amended by BCRA § 203. In January 2008, appellant Citizens United, a nonprofit corporation, released a documentary (hereafter "*Hillary*") critical of then-Senator Hillary Clinton, a candidate for her party's Presidential nomination. Concerned about possible civil and criminal penalties for violating § 441b, it sought declaratory and injunctive relief, arguing that (1) § 441b was unconstitutional as applied to *Hillary,* and (2) BCRA's disclaimer, disclosure, and reporting requirements, BCRA §§ 201 and 311, were unconstitutional as applied to *Hillary* and the television ads Citizens United produced to announce the availability of *Hillary* on cable television through video-on-demand. Applying an

objective test to determine whether *Hillary* was the functional equivalent of express advocacy, the Court found that there was "no reasonable interpretation of *Hillary* other than as an appeal to vote against Senator Clinton. Under the standard stated in *McConnell* and further elaborated in *WRTL,* the film qualifies as the functional equivalent of express advocacy." *Id.* at 326.

The Court then proceeded to "exercise . . . its judicial responsibility" to consider the facial validity of § 441b, explaining that "[a]ny other course of decision would prolong the substantial, nationwide chilling effect caused by § 441b's prohibitions on corporate expenditures." *Id.* at 333. The Court once again traced the history of campaign finance regulation, and characterized the dilemma at hand in terms of "confront[ing] . . . conflicting lines of precedent: a pre-*Austin* line that forbids restrictions on political speech based on the speaker's corporate identity[[7]] and a post-*Austin* line that permits them." *Id.* at 348. The Court reconfirmed that "[p]olitical speech is 'indispensable to decisionmaking in a democracy, and this is no less true because the speech comes from a corporation rather than an individual.'" *Id.* at 349. The Court rejected the reasoning of *Austin*, finding it "irrelevant for purposes of the First Amendment that corporate funds may 'have little or no correlation to the public's support for the corporation's political ideas,' . . . [because a]ll speakers, including

---

[7]In *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), the Supreme Court held that political speech may be banned based on the speaker's corporate identity, having found "a compelling governmental interest in preventing 'the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas.'" *Citizens United*, 558 U.S. at 348 (citing *Austin*, 494 U.S. at 660).

individuals and the media, use money amassed from the economic marketplace to fund their speech. The First Amendment protects the resulting speech, even if it was enabled by economic transactions with persons or entities who disagree with the speaker's ideas." *Id.* at 351 (quoting *Austin,* 494 U.S. at 660). The Court then overruled *Austin*, based on the "principle established in *Buckley* . . . that the Government may not suppress political speech on the basis of the speaker's corporate identity. No sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations." *Id.* at 365.

The Court next addressed Citizens United's challenge to BCRA's disclaimer and disclosure provisions as applied to *Hillary* and the advertisements for the movie. The Court acknowledged that "[d]isclaimer and disclosure requirements may burden the ability to speak, but they 'impose no ceiling on campaign-related activities,' *Buckley*, 424 U.S. at 64 . . . and 'do not prevent anyone from speaking,' *McConnell*, [540 U.S.] at 201. . . ." *Citizens United*, 558 U.S. at 366. Under the "exacting scrutiny" standard that requires a "substantial interest" between the disclosure requirement and a "sufficiently important" governmental interest, the Court found the statute valid as applied to the ads for the movie and to the movie itself. In so concluding, the Court reiterated the governmental interests identified in *Buckley*, 424 U.S. at 66, and rejected the argument that "the disclosure requirements in § 201 must be confined to speech that is the functional equivalent of express advocacy." *Citizens United*, 558 U.S. at 368.

> The Court has explained that disclosure is a less restrictive alternative to more comprehensive regulations of speech. . . . In *Buckley*, the Court upheld a disclosure requirement for independent expenditures even though it invalidated a provision that imposed a ceiling on those expenditures. . . .

> In *McConnell*, three Justices who would have found § 441b to be unconstitutional nonetheless voted to uphold BCRA's disclosure and disclaimer requirements. . . . And the Court has upheld registration and disclosure requirements on lobbyists, even though Congress has no power to ban lobbying itself. . . . For these reasons, we reject Citizens United's contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy.

*Id.* at 369. Finally, because Citizens United offered no evidence that its members may face threats, harassment, or reprisals if their names were disclosed, the Court found no showing that BCRA's disclaimer and disclosure requirements to the movie and ads would impose a chill on speech or expression. The Court found no constitutional impediment to the application of such requirements to the movie and ads at issue. *Id.* at 370-371.

**B. Circuit Court Precedent**

When asked about cases most analogous to the facts at bar, the parties (not surprisingly) identified different cases. For its part, DSF identified *Buckley v. Valeo*, 519 F.2d 821 (D.C. Cir. 1975),[8] and the discussion therein related to now repealed FECA § 437a, which provided that:

> Any person (other than an individual) who expends any funds or commits any act directed to the public for the purpose of influencing the outcome of an election, or who publishes or broadcasts to the public any material referring to a candiate (by name, description, or other reference) advocating the election or defeat of such candidate, setting forth the candidate's position on any public issue, his voting record, or other official acts . . ., or otherwise designed to influence individuals to cast their votes for or against such candidate or to withhold their votes from such candidate shall file reports with the [FEC] as if such person were a political committee. The reports filed by such person shall set forth the source of the funds used in carrying out any activity described in the preceding sentence in the same detail as if the funds were contributions within the meaning of section 431(3) of this

---

[8](*See* D.I. 32 at 6)

> title, and payments of such funds in the same detail as if they were expenditures within the meaning of section 431(f) of this title.

*Id.* at 869-870 (citing 2 U.S.C. § 437a (repealed by Pub. L. 94-283, § 105, 90 Stat. 475 (May 11, 1976))). The D.C. Circuit observed at the outset of its analysis that "the activity summoning the report is calculated to exert an influence upon an election. But section 437a is susceptible to a reading necessitating reporting by groups whose only connection with the elective process arises from completely nonpartisan public discussion of issues of public importance," including such groups as plaintiffs.[9] *Id.* at 870. In distinguishing between the disclosure requirements of § 437a and the central disclosures requirements of FECA pertaining to "political committees" and to "contributions" and "expenditures," the court grounded its decision to uphold the latter requirements on its

> recognition that the government has demonstrated a substantial and legitimate interest in protecting the integrity of its elections, an interest closely connected to and plainly advanced by those provisions.
>
> Section 437a, however, seeks to impose the same demands where the nexus may be far more tenuous. As we have said, it may undertake to compel disclosure by groups that do no more than discuss issues of public interest on a wholly nonpartisan basis. To be sure, any discussion of important public questions can possibly exert some influence on the outcome of an election . . . . But unlike contributions and expenditures made solely with a view to influencing the nomination or election of a

---

[9]Human Events, Inc., "the publisher of a weekly newspaper devoted primarily to events of political importance and interest," and the New York Civil Liberties Union, an organization that "engage[s] publicly in nonpartisan activities which 'frequently and necessarily refer to, praise, criticize, set forth, describe or rate the conduct or actions of clearly identified public officials who may also happen to be candidates for federal office.'" 590 F.2d at 870-71. With respect to the latter, it sufficiently demonstrated a "'threat of specific future harm,' . . .([to wit] disclosure would cause loss of contributions from those who currently insist that their gifts remain confidential)." *Buckley v. Valeo*, 519 F.2d at 871 n.130.

> candidate, *see* 2 U.S.C. §§ 431(e), 431(f), issue discussions unwedded to the cause of a particular candidate hardly threaten the purity of elections. Moreover, and very importantly, such discussions are vital and indispensable to a free society and an informed electorate. Thus the interest of a group engaging in nonpartisan discussion ascends to a high plane, while the governmental interest in disclosure correspondingly diminishes.

*Id.* at 872-873. Despite an unmistakable congressional intention to apply the statute broadly,[10] the court concluded that "the crucial terms 'purpose of influencing the outcome of an election' and 'design[ ] to influence' voting at an election stand without any readily available narrowing interpretation" and, thus, were unconstitutionally vague and over-broad. *Id.* at 877-878. This holding was not appealed and, therefore, not subject to the Supreme Court review in *Buckley*, 424 U.S. at 11 n.7.

Defendants, for their part, direct the court's attention to *Center for Individual Freedom, Inc. v. Tennant* ("*CFIF*"), 706 F.3d 270 (4th Cir. 2013), where the Fourth Circuit reviewed West Virginia's campaign finance laws.[11] Defendants find most relevant to the dispute at bar the challenge in *CFIF* to West Virginia's definition of "electioneering communication" found in W. Va. Code § 3-8-1a(12)(A), to wit,

> any paid communication made by broadcast, cable or satellite signal, or published in any newspaper, magazine or other periodical that:
> (i) Refers to a clearly identified candidate . . .;
> (ii) Is publicly disseminated within:
> (I) Thirty days before a primary election . . .; or
> (II) Sixty days before a general . . . election . . .; and
> (iii) Is targeted to the relevant electorate . . . .

---

[10]According to the legislative history included in the court's opinion, the provision was intended "to apply indiscriminately," "bring[ing] under the disclosure provisions many groups, including liberal, labor, environmental, business and conservative organizations." *Id.* at 877 & n.140 (citing 120 Cong. Rec. H10333 (daily ed. Oct. 10, 1974) (statement of Rep. Frenzel)).

[11](*See* D.I. 33 at 1)

W. Va. Code § 3-8-1a(12)(A). In *CFIF*, plaintiff challenged the definition's inclusion of materials "published in any newspaper, magazine or other periodical." 706 F.3d at 281-282. In this context, and applying "exacting scrutiny" for its evaluation of the campaign finance disclosure provisions, the Fourth Circuit found that West Virginia could rely on its interest of "providing the electorate with election-related information." *Id.* at 283. The Fourth Circuit concluded, however, that West Virginia had "failed to demonstrate a substantial relation between its interest in informing the electorate and its decision to include periodicals - but not other non-broadcast materials - in its 'electioneering communication' definition." *Id.* More specifically, the Court found that, "[a]lthough the affidavits that West Virginia submitted sufficiently support its decision to regulate periodicals and other non-broadcast media, they do not justify the legislature's decision to regulate periodicals to the exclusion of other non-broadcast media, such as direct mailings." *Id.* at 285. "[E]rr[ing] on the side of protecting political speech rather than suppressing it," *id.*, the Fourth Circuit determined that "limiting the campaign finance regime's applicability to only broadcast media causes it to burden fewer election-related communications." *Id.*

**C. Likelihood of Success on the Merits**

Starting where defendants left off, as far as the court can discern, there is no case that purports to address disclosure requirements with the breadth attributed to the Act.[12] As noted by DSF, many of the cases identified by defendants relate to statutes that only regulate express advocacy or its functional equivalent (not the mere mention

---

[12]The Delaware Election Disclosures Act, 15 Del. C. § 8001, *et seq.*, as defined in part I, introduction.

of a candidate),[13] while other cases (including *CFIF*) involve statutes that have exemptions from the reporting requirements, such as those exempting § 501(c)(3) activity from disclosure[14] or those exempting such publications as voter guides.[15] Consequently, when the Fourth Circuit in *CFIF* upholds the constitutionality of West Virginia's substantive disclosure requirement, W. Va. Code § 3-8-2b(b)(5), which mandates the disclosure of certain contributors "whose contributions were used to pay for electioneering communications," one cannot ignore the context of the decision, where the West Virginia legislature, by its exemptions to the definition of "electioneering communication"[16] and its preamble to the regulations,[17] made clear that its intended focus was on express advocacy. Indeed, where a legislature (Congress) clearly intended otherwise, i.e., to embrace virtually all political communications and communicators, the D.C. Circuit rejected the resulting statutory language as being over-

---

[13](*See* D.I. 32 at 7 n.8)

[14](*See* D.I. 43 at 7 n.9)

[15](*See* D.I. 32 at 7 n.10) Because the characterization of DSF's proposed "voter guide" has not been the subject of this motion practice, the court will assume for purposes of its analysis that it would pass muster as a nonpartisan voter guide.

[16]Including, e.g., "[a] communication, such as voter's guide, which refers to all of the candidates for one or more offices, which contains no appearance of endorsement for or opposition to the nomination or election of any candidate and which is intended as nonpartisan public education focused on issues and voting history." W. Va. Code § 3-8-1a(12)(B)(viii).

[17]*See* W. Va. Code § 3-8-1(a)(6): "Disclosure by persons and entities that make expenditures for communications that expressly advocate the election or defeat of clearly identified candidates, or perform its functional equivalent, is a reasonable and minimally restrictive method of furthering First Amendment values by public exposure of the state election system."

broad. *See Buckley v. Valeo*, 519 F.2d at 877-78 and 877 n.140.

The question remains how to apply the guidance of *Citizens United* to the Act which, by its language, is broad enough in scope to capture neutral communications similar to those exempted by West Virginia's legislature and deemed over-broad by the court in *Buckley v. Valeo,* 519 F.2d at 877. The court notes at this juncture that the Supreme Court's relatively terse discussion about disclosure in *Citizens United* is based in large measure on citations to its precedential opinions in *Buckley* and *McConnell,* neither of which were as-applied challenges and neither of which addressed a statutory regime as broadly constructed (and apparently construed) as the one at bar. As noted above, the disclosure requirements under examination in *Buckley* were those directed to contributions made by individuals, as well as contributions to minor parties and independent candidates. The Court had no problem finding that the governmental interests in disclosure were substantially related to its interests in election transparency when reviewing the application of the disclosure requirements to contributions to minor parties and independent candidates, obviously participants in the political process.

The Court had more difficulty applying such requirements to individual contributors and, in that context, found "the relation of the information sought to the purposes of the Act . . . too remote." *Buckley,* 424 U.S. at 79-80. To insure that the reach of 434(e) was not impermissibly broad, the Court construed "expenditure" for purposes of that section "to reach only funds used for communications that expressly advocate[d] the election or defeat of a clearly identified candidate." *Id.* at 80. The Court in *McConnell,* while rejecting the notion that "*Buckley* drew a constitutionally

mandated line between express advocacy and so-called issue advocacy," *McConnell*, 540 U.S. at 190, nevertheless rooted its decision to uphold the disclosure requirements to "evidence in the record that independent groups were running **election-related advertisements** 'while hiding behind dubious and misleading names.'" *Citizens United*, 558 U.S. at 367 (emphasis added) (citing to *McConnell*, 540 U.S. at 197).

Although the First Amendment does not "erect[ ] a rigid barrier between express advocacy and so-called issue advocacy," the Supreme Court continues to demand, under an "exacting scrutiny standard," that the government's interest in obtaining information about a communicator must be substantially related to a sufficiently important governmental interest, e.g., election transparency. It would appear as though other legislative efforts have translated this guidance into exempting from disclosure requirements those **communicators** generally considered to be non-political (e.g., § 501(c)(3) groups) and/or those **communications** generally considered to be non-political (e.g., voter guides), the reasoning being that the less a communicator or communication advocates an election result, the less interest the government should have in disclosure when weighed against the important First Amendment rights at stake.

The Act has no such exemptions, apparently leaving to the Commissioner (and the less transparent administrative regulation process) any efforts to perhaps more narrowly tailor the Act's disclosure requirements to communicators/communications more likely to raise concerns about partisan politics. In this regard, the court notes that the focus of the Act was actually on communications that are the functional equivalent

of advocacy, e.g., on "sham issue ads,"[18] voter guides,[19] and even advertisements that encourage recipients to contact officeholders and candidates, all described in the record in terms of advocacy, i.e., as efforts intended "to affect voters' choices at the ballot box." (D.I. 30, ex. 4 at 4)

The court recognizes that it is never an easy task for the legislature to draw lines when it comes to restricting constitutional rights. A fully informed electorate is a worthy goal recognized by the Supreme Court.[20] Nevertheless, as presented, the Act is so broadly worded as to include within the scope of its disclosure requirements virtually every communication made during the critical time period, no matter how indirect and unrelated it is to the electoral process.[21] On the record presented, this would include DSF's proposed voter guide (as a presumably neutral communication) published by

---

[18]Described as "campaign advertisements that target candidates right before an election, but escape disclosure by avoiding the 'magic words' of express advocacy like 'vote for' or 'vote against' that have traditionally triggered disclosure requirements." (D.I. 30, ex. 2 at 2)

[19]"Voter guides are typically intended to influence voter behavior," despite "lacking words of express advocacy." (*Id.*, ex. 3 at 4-5)

[20]The court notes the difference between educating - providing information to the public - and "influencing" - affecting the conduct, thought or character of the public. As reflected in the legislative history, the Act was intended to control the latter form of communication, not the former.

[21]Any one who contributes to such civic organizations as the League of Women Voters, the American Civil Liberties Union of Delaware, or Common Cause might well expect to have their names and addresses listed as a matter of public record, because such organizations tend to discuss the actions of clearly identified public officials. The Act, however, is broad enough to cover the contributors to any charitable organization, e.g., those advocating such causes as a cure for cancer or support for wounded war veterans, if the organization publishes a communication within the critical time frame that so much as mentions, even in a non-political context, a public official who happens to be a candidate.

DSF (a presumably neutral communicator by reason of its 501(c)(3) status). The court concludes that the relation between the personal information collected[22] to the primary purpose of the Act[23] is too tenuous to pass constitutional muster.[24] Therefore, DSF is likely to prevail on the merits of its claim that the Act, as applied, is unconstitutional.

### D. Balance of Harms

In the Third Circuit, "[i]t is well established that 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Having found that DSF has demonstrated a likelihood of success on the merits of their First Amendment claim, and concluding that defendants' interest in public disclosure cannot withstand the public's interest in protecting their privacy of association and belief guaranteed by the First Amendment, the court concludes that the balance of harms weighs in favor of DSF.

## IV. CONCLUSION

For the reasons states, DSF's motion for a preliminary injunction (D.I. 22) is granted. The court recognizes, however, that the factual underpinnings for its decision have not been specifically challenged or vetted through discovery. Therefore, no order

---

[22]Like the metadata collected by the National Security Administration.

[23]Regulating anonymous political advocacy.

[24]And, indeed, those who want to circumvent the intent of the Act will simply contribute anonymously. It will likely be the First Amendment rights of non-political contributors that will end up being violated by the intrusive collection of personal information - the full name and mailing address of each person who has made contributions in excess of $100 during the election period - information that is unrelated to the regulation of abusive political activity.

shall be executed until the court has conferred with the parties at the scheduled April 1, 2014 telephonic status conference.